**18 MAG 8202** ORIGINAL

Approved: _____
        PAUL MONTELEONI/CATHERINE GHOSH
        Assistant United States Attorneys

Before:  THE HONORABLE STEWART D. AARON
        United States Magistrate Judge
        Southern District of New York

- - - - - - - - - - - - - - - - - - X
                                    :    SEALED COMPLAINT
UNITED STATES OF AMERICA            :
                                    :    Violations of
    - v. -                          :    18 U.S.C. §§ 371, 641,
ELIANA BAUTA,                       :    666, 1028A, 1349, and 2
GERALDINE PEREZ, and                :
ERIC GONZALES,                      :    COUNTY OF OFFENSE:
                                    :    BRONX
                Defendants.         :
                                    :
- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        JULIA TURRET, being duly sworn, deposes and says that
she is a Special Investigator with the New York City Department
of Investigation, Office of the Inspector General, and charges
as follows:

## COUNT ONE
### (Conspiracy to Commit Federal Program Theft)

        1.    From at least in or about 2013, up to and
including in or about 2017, in the Southern District of New York
and elsewhere, ELIANA BAUTA, GERALDINE PEREZ, and ERIC GONZALES,
the defendants, and others known and unknown, willfully and
knowingly did combine, conspire, confederate, and agree together
and with each other to commit offenses against the United
States, to wit, violations of Title 18, United States Code,
Section 666(a)(1)(A).

        2.    It was a part and object of the conspiracy that
ELIANA BAUTA, the defendant, an agent and employee of an agency
of a local government, to wit, the New York City Human Resources
Administration ("HRA"), said agency receiving benefits in excess
of $10,000 under a Federal program involving a federal grant,
contract, subsidy, loan, guarantee, insurance, and other form of
Federal assistance each year between 2013 and 2017, and

GERALDINE PEREZ and ERIC GONZALES, the defendants, embezzled, stole, obtained by fraud, and otherwise without authority knowingly converted to the use of a person other than the rightful owner, and intentionally misapplied, property worth at least $5,000 and owned by such agency, to wit, BAUTA, without authorization from HRA, provided relatives and acquaintances, including PEREZ and GONZALES, with HRA benefits and stolen HRA checks to which they were not entitled, and then split the proceeds of such benefits and checks with such relatives and acquaintances, in violation of Title 18, United States Code, Section 666(a)(1)(A).

### Overt Acts

3.     In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York:

a.     On or about August 1 and September 8, 2014, in the Bronx, New York, ELIANA BAUTA, the defendant, submitted applications to apply funds to an individual's Electronic Benefit Transfer card allegedly for expenses incurred after an alleged disaster, but which in fact were repayment to the individual for services rendered by the individual to BAUTA.

b.     On or about December 29, 2014, in the Bronx, New York, BAUTA caused an emergency benefits check to be issued to ERIC GONZALES, the defendant, for benefits to which GONZALES was not entitled.

c.     On or about January 16, 2015, in the Bronx, New York, GERALDINE PEREZ, the defendant, deposited an emergency benefits check received as a result of an application processed by BAUTA for storage fees that PEREZ had not incurred.

d.     On or about April 13, 2015, in the Bronx, New York, PEREZ deposited an HRA check which was made out to another individual, which she had received from BAUTA, into PEREZ's own bank account.

e.     On or about August 15, 2015, in the Bronx, New York, GONZALES withdrew from his bank account approximately $2,660 in proceeds from HRA checks made out to other individuals and which had been provided to him by BAUTA.

(Title 18, United States Code, Section 371.)

2

## COUNT TWO
### (Federal Program Theft)

4.     From at least in or about 2013, up to and
including in or about 2017, in the Southern District of New York
and elsewhere, ELIANA BAUTA, the defendant, being an agent and
employee of an agency of a local government, to wit, HRA, said
agency receiving benefits in excess of $10,000 under a Federal
program involving a grant, contract, subsidy, loan, guarantee,
insurance, and other form of Federal assistance each year
between 2013 and 2017, aided and abetted by GERALDINE PEREZ and
ERIC GONZALES, the defendants, embezzled, stole, obtained by
fraud, and otherwise without authority knowingly converted to
the use of a person other than the rightful owner, and
intentionally misapplied, property worth at least $5,000 and
more owned by or under the care, custody, and control of such
agency, to wit, BAUTA, without authorization from HRA, caused
relatives and acquaintances, including PEREZ and GONZALES, to be
provided with HRA emergency benefits to which they were not
entitled, and then split the proceeds of such benefits with such
relatives and acquaintances, in violation of Title 18, United
States Code, Section 666(a)(1)(A).

(Title 18, United States Code, Sections 666(a)(1)(A) and 2.)

## COUNT THREE
### (Federal Program Theft)

5.     From at least in or about 2014 through in or
about 2017, in the Southern District of New York and elsewhere,
ELIANA BAUTA, the defendant, being an agent and employee of an
agency of a local government, to wit, HRA, said agency receiving
benefits in excess of $10,000 under a Federal program involving
a grant, contract, subsidy, loan, guarantee, insurance, and
other form of Federal assistance each year between 2014 and
2017, aided and abetted by GERALDINE PEREZ and ERIC GONZALES,
the defendants, embezzled, stole, obtained by fraud, and
otherwise without authority knowingly converted to the use of a
person other than the rightful owner, and intentionally
misapplied, property worth at least $5,000 and more owned by or
under the care, custody, and control of such agency, to wit,
BAUTA, without authorization from HRA or the intended recipients
of the checks, provided relatives and acquaintances, including
PEREZ and GONZALES, with stolen HRA checks to which they were
not entitled, and then split the proceeds of such checks with

3

such relatives and acquaintances, in violation of Title 18, United States Code, Section 666(a)(1)(A).

(Title 18, United States Code, Sections 666(a)(1)(A) and 2.)

## COUNT FOUR
### (Conspiracy to Commit Wire Fraud)

6.    From at least in or about 2013, up to and including in or about 2017, in the Southern District of New York and elsewhere, ELIANA BAUTA, GERALDINE PEREZ, and ERIC GONZALES, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, wire fraud in violation of Title 18, United States Code, Section 1343.

7.    It was a part and object of the conspiracy that ELIANA BAUTA, GERALDINE PEREZ, and ERIC GONZALES, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, BAUTA, without authorization from HRA, provided relatives and acquaintances, including PEREZ and GONZALES, with HRA emergency benefits to which they were not entitled, and then split the proceeds of such benefits with such relatives and acquaintances, and in furtherance thereof caused interstate wires to be sent.

(Title 18, United States Code, Section 1349.)

## COUNT FIVE
### (Conspiracy to Commit Bank Fraud)

8.    From at least in or about 2014, up to and including in or about 2017, in the Southern District of New York and elsewhere, ELIANA BAUTA, GERALDINE PEREZ, and ERIC GONZALES, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, bank fraud in violation of Title 18, United States Code, Section 1344.

4

9.     It was a part and object of the conspiracy that ELIANA BAUTA, GERALDINE PEREZ, and ERIC GONZALES, the defendants, and others known and unknown, willfully and knowingly would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, BAUTA, without authorization from HRA, provided relatives and acquaintances, including PEREZ and GONZALES, with stolen HRA checks to which they were not entitled, deposited or caused to be deposited such stolen checks at financial institutions in accounts in the names of such relatives and acquaintances, and split the proceeds of such checks with such relatives and acquaintances.

(Title 18, United States Code, Section 1349.)

## COUNT SIX
## (Aggravated Identity Theft)

10.     In or about December 2013, in the Southern District of New York and elsewhere, ELIANA BAUTA, the defendant, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, BAUTA used the tax identification number and forged signature of a New York City Police Department sergeant during and in relation to the felony violations charged in Counts One, Two and Four of this Complaint.

(Title 18, United States Code, Section 1028A(a)(1), (b).)

## COUNT SEVEN
## (Receiving Stolen Government Money or Property)

11.     From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York and elsewhere, GERALDINE PEREZ, the defendant, willfully and knowingly did receive, conceal and retain records, vouchers, money, and things of value of the United States and of a department and agency thereof, to wit, checks issued by the

5

United States Department of the Treasury to other individuals,
of a value exceeding $1,000, with intent to convert said
property to her use and gain, knowing said property to have been
embezzled, stolen, purloined and converted, in violation of
Title 18, United States Code, Section 641, to wit, PEREZ
received U.S. Treasury checks to which she was not entitled and
deposited or caused them to be deposited into bank accounts
under her control.

(Title 18, United States Code, Section 641.)

The bases for my knowledge and for the foregoing
charges are, in part, as follows:

12.  I am a Special Investigator with the New York
City Department of Investigation – Office of the Inspector
General ("DOI") and have been with the DOI for approximately
three years.  Through my training and experience, I have become
familiar with various public assistance programs that are
administered by New York City.

13.   I have participated in the investigation of this
matter, and I am familiar with the information contained in this
affidavit based on my own personal participation in the
investigation, my review of documents, and conversations that I
have had with other law enforcement officers and other
individuals.  Because this affidavit is being submitted for the
limited purpose of establishing probable cause, it does not
include all the facts that I have learned during the course of
my investigation.  Where the contents of documents, and the
actions and statements of others are reported herein, they are
reported in substance and in part, except where otherwise
indicated.

### OVERVIEW AND SUMMARY OF THE SCHEMES

14.   The New York City Human Resources Administration
("HRA") is an agency of the City of New York (the "City")
responsible for administering the majority of the City's public
assistance programs.  Among other things, HRA provides
temporary, emergency cash assistance to individuals and families
with social service and economic needs to assist them in
reaching self-sufficiency.

15.   Since in or about 2015, the DOI has been
investigating two related schemes, as described further below,
in which an HRA employee – ELIANA BAUTA, the defendant –

6

defrauded HRA and the City by using her position to commit public assistance fraud. BAUTA worked as a Job Opportunity Specialist for HRA from approximately January 2008 to on or about May 23, 2018. During the times relevant to this Complaint, BAUTA worked at HRA's office in Crotona, Bronx (the "Crotona Center"). As a Job Opportunity Specialist, BAUTA was at various points responsible for interviewing benefits applicants, compiling and submitting applicants' paperwork, and disbursing applicants' benefits.

16.    As described further below, in the first of the two schemes (the "Fraudulent Issuance Scheme"), ELIANA BAUTA, the defendant, caused the fraudulent issuance of emergency benefits funds to relatives and acquaintances, including GERALDINE PEREZ and ERIC GONZALES, the defendants, among others, who in truth and in fact did not qualify for those funds.

17.    In the second scheme (the "Stolen HRA Checks Scheme"), ELIANA BAUTA, the defendant, obtained access to and misappropriated emergency benefits checks issued to actual HRA clients. Instead of providing the checks to the legitimate clients in need of emergency funding, BAUTA gave them to GERALDINE PEREZ and ERIC GONZALES, the defendants, among other of BAUTA's relatives and associates, who deposited the checks in their own bank accounts and withdrew the funds, and then shared the proceeds with BAUTA.

18.    In total, the two schemes described above resulted in losses to HRA of more than $300,000 in public funds.

19.    In addition to obtaining stolen HRA checks into her bank account and the bank accounts of family members, GERALDINE PEREZ, the defendant, has also deposited or caused to be deposited into these same accounts improperly obtained United States Treasury checks that were issued to other individuals as tax refunds (the "Stolen Treasury Funds Scheme"). In total, 23 such checks worth over $91,000 were deposited into bank accounts of PEREZ and her family members and associates.

## OVERVIEW OF BENEFITS ADMINISTERED BY HRA

20.    Based on my conversations with HRA employees and other law enforcement officers, and my review of HRA policies and procedures, I have learned the following:

a.    HRA, among other functions, provides temporary, emergency cash assistance to individuals and families

7

with social service and economic needs to assist them in reaching self-sufficiency.  HRA does so by administering various programs funded by the federal government, as well as by both New York State and City.

          b.    With respect to federal funding, for each year beginning in 2013, HRA has received hundreds of millions of dollars in funding from the federal government's Temporary Assistance to Needy Families block grant program.  Among the HRA programs funded directly by the Temporary Assistance to Needy Families program are the Emergency Assistance to Needy Families program and the Family Assistance program for low-income households with children.

          c.    When a New York City resident experiences a qualifying catastrophic event (such as the loss of their residence), HRA employees evaluate the applicant's eligibility for the Emergency Assistance to Needy Families program, the Family Assistance program, and analogous programs funded by New York State and City (together, the "Emergency Benefits"). If an applicant qualifies, she or he receives emergency assistance to cover documented expenses such as advance rent to secure a new apartment, storage costs, or household items.

          21.  Based on my training and experience, my review of HRA documents, and my conversations with other law enforcement agents, I have learned the following:

          a.    An applicant must apply for Emergency Benefits at a local HRA Job Center, that is, an HRA office in their borough of residence.  The applicant must supply supporting documentation about the qualifying life event (such as loss of residence), the applicant's income, and other documents attesting to the applicant's need for relief.

          b.    HRA requires an applicant seeking cash assistance to provide the requisite information and documentation to HRA employees called "Job Opportunity Specialists," one of whom was ELIANA BAUTA, the defendant.  Job Opportunity Specialists input and upload this information into HRA electronic systems and open a case as a result of the application.  The Job Opportunity Specialists input and upload this information directly into an online application called the "Paperless Office System" or, if that system is unavailable, a back-up system called the "Paperless Alternate Module System." Information from all applications submitted via these systems are reported into a New York statewide database called the

Welfare Management System.  A Job Opportunity Specialist, in entering an application into the Paperless Office System or Paperless Alternate Module System, also enters an electronic request that benefits be issued to the recipient.  A supervisor reviews the application and supporting documentation that was inputted by the Job Opportunity Specialist and decides whether to approve the application and the electronically requested benefits.

           c.     Successful applicants receive their Emergency Benefits issuance in one of two ways.  If the applicant already receives other benefits from HRA, such as nutrition assistance (food stamps), and has an electronic benefit transfer ("EBT") card, the Emergency Benefits funds may be wired directly to the EBT card, and can then be withdrawn from the card as cash in banks and at ATMs or check cashing establishments.[1]  HRA may also issue the funds via a check from the Disbursements & Collections Unit ("D&C Unit") that must be picked up in person from the center.  Such checks may be issued in the name of the applicant if they are for the applicant's personal use, or in the name of the applicant and another party if the funds are owed by the applicant to another party (such as a landlord or storage company).

           d.     All individuals picking up checks at the D&C Unit must sign a signature log and present a valid ID. Checks remain with the D&C Unit until they are picked up, and are valid for six months.  If not negotiated within that time frame, checks are supposed to be cancelled by D&C staff.

           e.     HRA policy bars HRA employees from accessing, reviewing, or working on case records pertaining to themselves, relatives, friends, or acquaintances.  Further, all HRA employees must acknowledge the HRA code of conduct, which states, among other things, "Employees shall not knowingly make any false entry upon, or alter any record of the City or Agency nor shall any employee submit, or cause to be submitted, any false document."

---

[1] The HRA EBT vendor maintains its financial records in Austin, Texas, and each time a client swipes his or her EBT card, the verification of funds and transaction approval go through this vendor's database in Texas.  Therefore, the use of EBT cards – including EBT cards that were fraudulently credited with funds – involves interstate wires.

22. From reviewing HRA records, I know that in each year from 2013 through 2017, HRA has received in excess of $10,000 annually in federal funding.

## THE FRAUDULENT ISSUANCE SCHEME

23. Based on my training and experience; my participation in the investigation; my review of the Welfare Management System activity log of ELIANA BAUTA, the defendant, computer files, other HRA records, bank records, and phone records; and my discussions with other law enforcement agents, I have learned that from approximately 2013 through approximately 2017, BAUTA caused the issuance of over $101,000 in Emergency Benefits to the public assistance accounts of at least nine of her relatives and acquaintances, in each instance either without sufficient documentation, without any documentation, or using fraudulent documentation.[2]

24. Specifically, I have learned from my review of an audit of the Welfare Management System, Paperless Office System, and Paperless Alternate Module System that ELIANA BAUTA, the defendant, entered at least 16 applications resulting in the issuance of Emergency Benefits to BAUTA's relatives and acquaintances.[3] These 16 applications were submitted with BAUTA's name as the listed Job Opportunity Specialist. With respect to each of these applications, Welfare Management System audit logs show that BAUTA's ID was used at her workstation to access the relatives' and acquaintances' accounts, and Paperless Office System audit reports show that BAUTA accessed the relatives' and acquaintances' cases on or about the days the applications were processed. In each case, the applications were supported by incomplete or false supporting documentation.

25. In addition to the benefits electronically requested and issued as a result of the 16 applications themselves, on some occasions, ELIANA BAUTA, the defendant, used the Paperless Office System or Paperless Alternate Module System to submit electronic requests for the issuance of additional benefits in the name of recipients who already had an open case.

---

[2] Additional amounts of Emergency Benefits were issued to some of these individuals by HRA employees other than BAUTA.

[3] These individuals are believed to be BAUTA's relatives and acquaintances based on, among other things, witness statements, birth certificates and other government records, social media postings, and phone records.

10

These additional benefit requests were not accompanied by separate applications, and were supported by false or incomplete documentation, or in some cases no documentation at all. Nevertheless, these additional benefit requests were also granted.  In total, the 16 applications and the additional benefit requests resulted in the issuance of approximately $101,803 in Emergency Benefits to BAUTA's relatives and acquaintances on the basis of false, incomplete, or nonexistent supporting documentation.

26.  Among other examples of the scheme perpetrated by ELIANA BAUTA, the defendant, are the following:

a.  In or about July 2014, BAUTA entered into HRA's Paperless Office System an application for her mother to receive Emergency Benefits to replace household items due to an alleged disaster.  BAUTA also uploaded to HRA's document upload system[4] a supporting document purportedly from the New York City Fire Department ("FDNY") describing a fire at a particular apartment on East 233rd Street in the Bronx, New York.[5]  The document as scanned by BAUTA into the system is illegible in parts and the names and full address are not visible.   I obtained a copy of the same incident report from the FDNY, which shows that an individual other than BAUTA's mother was the victim of the fire (the "Fire Victim").  I know from my review of HRA documents related to the Fire Victim that BAUTA had previously processed a claim for Emergency Benefits for the Fire Victim and included legible copies of the FDNY report in the Fire Victim's file.  Therefore, I believe that BAUTA obtained the FDNY report from a legitimate HRA client and then submitted a version that was illegible in parts in support of a fraudulent application to obtain benefits issued under her mother's name.

b.  BAUTA did not have any formal role in approving her mother's application, but — in addition to entering the application and uploading the fraudulent supporting document into HRA's computer systems — BAUTA was responsible,

---

[4] This system does not identify the user uploading any particular document, but I believe BAUTA uploaded this document because BAUTA was the user processing the application, BAUTA accessed the application on the application date, and, as set forth below, this particular supporting document was derived from a document that had been submitted to HRA in a different case of BAUTA's, giving BAUTA access to the document.

[5] In fact, BAUTA's mother did not live at that address.

once the application was approved, for preparing the necessary documentation to cause the disbursement of the Emergency Benefits.  Subsequently, HRA disbursed approximately $1,600 in Emergency Benefits in the name of BAUTA's mother to an EBT card that had already been issued to BAUTA's mother in connection with a different application.  The benefits were then converted to cash at bank branches located in the Bronx.

       c.   On or about August 1 and September 8, 2014, BAUTA entered into the Paperless Office System applications for a particular individual ("Individual-1") for Emergency Benefits after an alleged disaster.[6]  As a result of the application, Individual-1 obtained benefits that were supposed to be used to replace household items and provide advance rent for a new apartment.  In fact, Individual-1 admitted to law enforcement agents that he knew BAUTA because he "read cards" for her[7] and, on two occasions, BAUTA put funds on Individual-1's EBT card not due to any disaster but as compensation for Individual-1's having put a supernatural curse on an ex-boyfriend of BAUTA.

       d.   In or about December 2013, BAUTA entered into the POS system an application for BAUTA's grandmother (the "Grandmother") to receive Emergency Benefits to replace an allegedly "lost/stolen SSI check,"[8] which included as supporting documentation a New York City Police Department ("NYPD") complaint report (the "Forged Complaint") and an HRA form describing a purported NYPD report or referral (the "Forged Referral").  The Forged Complaint describes an October 23, 2013 purse theft at a department store.  From my review of what I believe to be the true NYPD complaint describing this incident (the "True Complaint"),[9] I believe the Forged Complaint includes

---

[6] The application did not specify the nature of the disaster.

[7] I believe this to be a reference to divination.

[8] Based on my training and experience, I believe that the reference to an "SSI check" refers to a Social Security Supplemental Security Income check.

[9] The True Complaint is identical to the Forged Complaint except for the alterations discussed herein (such as the Grandmother's name and higher loss amount written in in the Forged Complaint); for example, it has the same complaint number, time and location of occurrence, and victim's phone number. The True Complaint was filed with the NYPD by an individual who had applied to BAUTA for Emergency Benefits in approximately November 2013 but whose application was denied as showing "no immediate need."  I therefore believe BAUTA obtained the True Complaint from this

the following false information: the Grandmother's name is
written in as the victim in place of the actual victim in the
True Complaint, in handwriting that appears to be BAUTA's;
information concerning an arrested suspect is whited-out; and a
$1,400 cash loss amount is written in (also in what appears to
be BAUTA's handwriting) in place of the actual cash loss amount
of $300.[10]  The Forged Referral includes the tax identification
number of an NYPD sergeant (the "Sergeant"),[11] a reported loss
amount of $1,400, and a signature allegedly from a "police
official."  I know from my discussions with the Sergeant that
although the tax identification number is hers, neither the
handwriting nor the signature on the Forged Referral are hers.
As a result of this application, which was subsequently
approved, $1,400 in funds were added to the Grandmother's EBT
card and withdrawn in cash at an ATM.

        e.   On or about May 1, 2014, BAUTA entered into
the Paperless Office System an application in the name of her
aunt (the "Aunt"), which was supported by inadequate
documentation bearing no apparent relation to the Aunt,
including an illegible lease agreement that did not show the
identity of the landlord or the tenant but that includes a
partially legible address with a zip code that does not match
any known address of the Aunt, and a fragment of a letter
apparently from the Social Security Administration that did not
specify the identity of the person receiving benefits.   This
application led to the issuance of Emergency Benefits in the
name of the Aunt, which were electronically transferred to the
Aunt's EBT card.   However, I have reviewed security camera
photographs from a check cashing store, which show that on or

---

individual and altered it before entering it in support of the
Grandmother's application in December 2013.

[10] Another altered version of the True Complaint was filed by
BAUTA in support of an application for BAUTA's mother; in that
case, the alleged loss amount handwritten into the altered
complaint was $1,000.   BAUTA's mother was then awarded $1,000 in
Emergency Benefits as a result of this application.

[11] A tax identification number is a unique identifying number for
NYPD employees, and the tax identification numbers for the law
enforcement officers involved in the purse theft incident
(including the Sergeant) are listed on the True and Forged
Complaints.   Although the Forged Referral had a line labeled
"shield number" on which the Sergeant's tax identification
number was written, a shield number is a different form of NYPD
identification.

13

about June 5, 2014, BAUTA, not the Aunt, withdrew $850 from the
Aunt's EBT card at the store.

    27. HRA records reflect that ELIANA BAUTA, the
defendant, entered or otherwise participated in the processing
of applications resulting in the issuance of approximately
$45,209 in Emergency Benefits in the name of GERALDINE PEREZ,
the defendant, between approximately 2013 and 2017.  Through my
participation in this investigation, including my discussions
with law enforcement agents and my interview of PEREZ, I have
learned the following, among other things, about PEREZ's
knowledge of and participation in the Fraudulent Issuance
Scheme:

    a. From approximately 2013 through
approximately 2017, BAUTA electronically requested on behalf of
PEREZ a series of payments for storage fees, furniture grants,
establishment of a home, and rental brokerage fees.  These forms
of assistance are short-term benefits intended for people who
either suffered a catastrophic event, are in the homeless
shelter system, or are leaving the shelter system.  Although an
apartment (the "Apartment") had suffered a fire in 2012 while
PEREZ was living there, I believe that the issuance of these
payments was improper for the following reasons:

    i. With respect to the funding for storage
fees, these fees—which took the form of checks made out to the
storage company and PEREZ—were deposited directly into PEREZ's
bank account rather than given directly to the storage company
as HRA policy requires.  In any event, I have spoken to the
PEREZ's landlord and confirmed that PEREZ continued to reside at
the Apartment for the entire relevant period following the fire
and therefore was not eligible for storage fee funding at all
under HRA policy.  As noted in paragraph 27(c) below, PEREZ
acknowledged that she had improperly received storage fee checks
and split them with BAUTA.

    ii. With respect to the grants for
establishment of a home and rental broker fees, these funds are
reserved for individuals moving from a homeless shelter to
private housing.  However, after speaking with representatives
of the New York City Department of Homeless Services, I am aware
that at no time was PEREZ a resident of a homeless shelter, and
thus was ineligible for these grants under HRA policy.

    iii. With respect to the payments issued to
PEREZ for replacement furniture after a disaster, PEREZ was

14

issued such grants multiple times, when under HRA policy she
would only have been eligible for a single grant based on the
2012 fire,[12] and there is no record of any additional disaster
after the 2012 fire.

        b.   On or about July 24, 2017, BAUTA uploaded to
the HRA's document upload system an invoice from a storage
company supposedly directed to PEREZ (the "False Invoice"),
purportedly to document storage fees.  In truth and in fact,
however, the False Invoice was adapted from an actual invoice
from the storage company to a different person (the "True
Invoice").[13]  The False Invoice has the same invoice number,
date, and storage unit number as the True Invoice; in fact, the
False Invoice is identical to the True Invoice except that it is
directed to PEREZ instead of the true recipient.  That same day,
two emergency checks were issued by HRA in the name of PEREZ and
the storage company, and one of these two checks was deposited
in a bank account controlled by PEREZ.

        c.   On or about February 6, 2018, I and other
law enforcement agents conducted a voluntary interview of PEREZ.
Among other things, PEREZ admitted to law enforcement agents
that she knew she had improperly received Emergency Benefits
checks from BAUTA, with whom she was friends, that were intended
for storage companies but which she instead received and cashed
herself.

       28.   HRA records reflect that ELIANA BAUTA, the
defendant, entered or otherwise participated in the processing
of applications resulting in the issuance of approximately
$19,728 in Emergency Benefits in the name of ERIC GONZALES, the
defendant, between approximately 2014 and 2015.

        a.   For example, on or about July 7, 2014, BAUTA
entered into HRA's Paperless Office System an application for
Emergency Benefits in the name of GONZALES.  A printout of this
application form was signed with a signature that appears to be
GONZALES's.  The application included, as supporting
documentation, a lease listing a different tenant instead of

[12] The grant awarded to PEREZ after the 2012 fire is not included
in the calculation of fraudulently issued benefits herein.

[13] The True Invoice had been submitted in a previous HRA case
handled by BAUTA.  Accordingly, I believe BAUTA was the user who
uploaded the False Invoice for reasons similar to those stated
in footnote 4, above.

15

GONZALES, and proof of Section 8 housing assistance listing a
different tenant instead of GONZALES.  As a result of this
application, $1485 in Emergency Benefits were issued in
GONZALES's name.

               b.     Additionally, on or about August 25, 2014,
BAUTA entered into HRA's Paperless Office System an application
for Emergency Benefits in the name of GONZALES.  This
application falsely stated that GONZALES was receiving Social
Security Supplemental Security Income ("SSI") benefit payments[14]
and included, as supporting documentation, an unreadable
document that was supposedly a lease and an unreadable document
that was supposedly an award of SSI.  From speaking to another
law enforcement officer who had contacted the Social Security
Administration ("SSA"), I know that the SSA has no record of
GONZALES receiving SSI benefit payments at any relevant time.
As a result of this application, $5,969 in Emergency Benefits
were issued in GONZALES's name.

               29.   On or about November 9, 2017, I and other law
enforcement agents conducted a voluntary interview with ERIC
GONZALES, the defendant, in which, among other things, he
admitted that he had received emergency benefits from ELIANA
BAUTA, the defendant, to which he knew he was not entitled.

THE STOLEN HRA CHECKS SCHEME

               30.   Based on my training and experience; my review of
the Welfare Management System activity log of ELIANA BAUTA, the
defendant, other HRA documents, bank records, and phone records;
and my discussions with other law enforcement agents, I have
learned that between approximately November 2014 and July 2017,
BAUTA stole at least 410 HRA Emergency Benefits checks (the
"Stolen HRA Checks") which had been issued in the names of other
HRA clients, and gave the checks to her friends and relatives,
including GERALDINE PEREZ and ERIC GONZALES, the defendants, who
deposited the Stolen HRA Checks and shared the proceeds with
BAUTA.  Specifically, I have learned the following:

               a.     BAUTA was transferred to the D&C Unit in
approximately 2015.  Job Opportunity Specialists in the D&C Unit
at the Crotona Center, including BAUTA, are responsible for
manually filling out Daily Client Check Signature Logs (the
"Signature Logs") when clients pick up Emergency Benefits checks

---

[14] Certain benefit programs administered by HRA are available
only to persons receiving SSI.

16

from the Crotona Center.  Job Opportunity Specialists must list the check number and the amount that the check is for, and the person retrieving the check must sign for it in the Signature Log.

        b.      Based on my discussion with DOI auditors who reviewed the documentation for Emergency Benefits checks issued from the Crotona Center between approximately 2014 and 2017, including Signature Logs and copies of checks, as well as my review of bank account information, I have learned that on numerous occasions, BAUTA appears to have filled out the Signature Logs to release Emergency Benefits checks for numerous individuals in whose accounts the checks were ultimately *not* deposited.  Instead, the checks were deposited into bank accounts of, among others, PEREZ, GONZALES, and BAUTA's sister.  Moreover, a number of other HRA checks—checks to which BAUTA had access but which were not recorded in the applicable Signature Log at all or for which the applicable Signature Logs were not available—were deposited into the same set of accounts, and were likewise made out to numerous individuals in whose accounts the checks were ultimately not deposited.  In total, approximately $240,723 in checks (the "Stolen HRA Checks") released by BAUTA or to which BAUTA had access appear to have been deposited between 2014 and 2017 into approximately 22 different bank accounts not associated with the individuals to whom the checks were made out, but instead with BAUTA's relatives and friends.[15]

        c.      For example, approximately 61 Stolen HRA Checks, worth approximately $33,735, were deposited into PEREZ's bank account.  Additionally:

- 54 Stolen HRA Checks, worth approximately $37,075, were deposited into a bank account associated with PEREZ's daughter;

- 36 Stolen HRA Checks, worth approximately $24,512, were deposited into bank accounts associated with PEREZ's son;

- 31 Stolen HRA Checks, worth approximately $17,845, were deposited into a bank account associated with PEREZ's nephew;

- 6 Stolen HRA Checks, worth approximately $1,997,

---

[15] Although some of the Stolen HRA Checks bounced, the vast majority — amounting to approximately $210,604 in stolen checks — were successfully deposited.

were deposited into bank accounts associated with
PEREZ's sister;

- 6 Stolen HRA Checks, worth approximately $2,638,
  were deposited into a bank account associated with
  PEREZ's daughter; and

- 5 Stolen HRA Checks, worth approximately $2,250,
  were deposited into a bank account associated with
  an individual I have interviewed and know to be a
  friend of PEREZ.[16]

In sum, approximately 199 Stolen HRA Checks, worth a total of
approximately $120,052, were deposited into the accounts of
PEREZ or PEREZ's relatives and friends.

            d.    In addition to the above Stolen HRA Checks
deposited into accounts associated with PEREZ (who, as noted
above (see supra ¶ 27(c)), is BAUTA's friend), over one hundred
Stolen HRA Checks were deposited into accounts associated with
other relatives and acquaintances of BAUTA, including the
following:

            i.    Approximately 139 Stolen HRA Checks
were deposited into three bank accounts in the name of an
individual who is now a cooperating witness ("CW-1"), worth a
total of approximately $80,034.  Stolen HRA Checks were first
deposited into a certain account ("CW-1 Account-1"), but CW-1
Account-1 was closed by the bank due to suspected fraudulent
activity on or about August 15, 2016.  Subsequently, the Stolen
HRA Checks were deposited into two new linked accounts at a
different bank (collectively "CW-1 Account-2").

            ii.   Approximately 29 Stolen HRA Checks,
worth approximately $18,589, were deposited into bank accounts
associated with GONZALES.

            iii.  Approximately 5 Stolen HRA Checks,
worth approximately $3,059, were deposited into bank accounts
associated with BAUTA's sister.

            iv.   Approximately 38 Stolen HRA Checks,
worth approximately $18,989, were deposited into bank accounts
associated with BAUTA's mother.

---

[16] This individual told investigators that PEREZ had provided the
individual with the checks as reimbursement for a debt PEREZ
owed the individual.

18

31.  CW-1 has entered into a nonprosecution agreement with the Government, and is cooperating with the Government pursuant to that agreement.[17]  Based on my discussions with CW-1, I have learned the following:

a.  At the request of ELIANA BAUTA, the defendant, CW-1 provided BAUTA his debit card to allow her to access CW-1 Account-1.  CW-1 was aware that BAUTA repeatedly made deposits into CW-1 Account-1, made withdrawals from CW-1 Account-1, and made internet purchases with funds from CW-1 Account-1, between approximately December 2015 and August 2016.

b.  BAUTA would routinely leave CW-1 a portion of the funds she deposited into CW-1 Account-1, or would provide him with cash payments.  She left or provided CW-1 these funds in exchange for CW-1's permission for BAUTA to use the account.

c.  BAUTA told CW-1 that she obtained the checks being deposited into CW-1's bank accounts from her job, and BAUTA also told CW-1, in substance, "Everybody at work does it."

d.  On two occasions, BAUTA provided CW-1 with checks and asked CW-1 to deposit them into CW-1 Account-1.  She told CW-1 to deposit these checks using an ATM, and also told him not to read the checks.  Despite this instruction, CW-1 looked at the checks and saw that they were addressed to persons other than CW-1 or BAUTA.

e.  After the bank closed CW-1 Account-1 in August 2016, BAUTA asked CW-1 to open a new account at a different bank and to grant her access to it.  CW-1 did this, opening CW-1 Account-2 several days after the bank closed CW-1 Account-1 and granting BAUTA access to it.

32.  From reviewing the bank records of CW-1 Account-2, I know that two HRA checks were deposited into CW-1 Account-2 and one of these checks bounced, causing the account to become overdrawn several weeks after the account was opened.  CW-1 Account-2 was closed by the bank in approximately September 2016.

---

[17] The information provided by CW-1 and related herein has been deemed reliable and has been corroborated in part by other sources, including HRA documents, bank records, and witness statements.

33.    I know from my discussions with several Crotona
Center clients (the "HRA Victims") whose checks were stolen by
ELIANA BAUTA, the defendant, and deposited by or into the
accounts of BAUTA's associates including GERALDINE PEREZ, the
defendant, that the HRA Victims had not given permission for the
Stolen HRA Checks to be deposited by the defendants or other
individuals.

34.    During the February 6, 2018 voluntary interview
of GERALDINE PEREZ, the defendant, referenced in paragraph 27(c)
above, PEREZ admitted, among other things, that she received
checks from ELIANA BAUTA, the defendant, in the names of other
people, that she deposited them into her bank account and —
after her account was closed — into the accounts of relatives of
hers, and that she would split the proceeds of the checks with
BAUTA.

35.    During the November 9, 2017 interview with ERIC
GONZALES, the defendant, referenced in paragraph 29, above,
GONZALES admitted, among other things, that he had received
public assistance checks which were made out to other people
from ELIANA BAUTA, the defendant, and that he deposited these
checks into his bank account and shared the proceeds with BAUTA.

### THE STOLEN TREASURY FUNDS SCHEME

36.    While investigating the schemes described above,
investigators became aware of U.S. Treasury checks in the names
of third parties that had been deposited into the above-
described bank accounts of GERALDINE PEREZ, the defendant, or
bank accounts of her family members.

37.    Based on my training and experience and my
discussions with other law enforcement agents, including agents
with the Internal Revenue Service ("IRS"), I have learned the
following about the issuance of Treasury tax refund checks and
about certain common tax refund fraud schemes:

a.    Pursuant to the Internal Revenue Code and
attendant regulations, individual taxpayers generally are
required annually to report their income, tax liabilities, and,
where appropriate, any claim for a refund on a U.S. Individual
Income Tax Return, Form 1040, which must be filed with the IRS,
which is part of the United States Department of the Treasury
(the "Treasury Department").

            b.    When a refund to an individual taxpayer is approved by the Treasury Department, the refund amount may be sent to the individual taxpayer in the form of a check issued by the Treasury Department and in the name of the individual taxpayer.

            c.    Citizens of the Commonwealth of Puerto Rico are issued Social Security numbers by the Social Security Administration.  Social Security numbers issued to people whose mailing addresses are in Puerto Rico begin with the numbers 580, 581, 582, 583, 584, 596, 597, 598, and 599 (the "Puerto Rican SSNs").  Natural born citizens of the Commonwealth of Puerto Rico are, upon birth, automatically granted United States citizenship.

            d.    Residents of Puerto Rico typically do not file tax returns with the IRS because such filing is not required as long as all of the Puerto Rico resident's income is derived from Puerto Rican sources.

            e.    It is a common criminal practice to file fraudulent tax returns using the stolen identities of residents of Puerto Rico in order to obtain tax refunds.  By using Puerto Rican identities and SSNs, participants in such schemes, among other things, minimize the risks that a legitimate federal tax return already will have been filed by the person whose identity has been stolen.  Participants in such schemes obtain the federal tax refund checks in various ways, including by causing them to be mailed by the United States Treasury, and then cashing or depositing those checks into bank accounts.

        38.    Between 2012 and 2016, a series of Treasury checks made out in others' names ("Improperly Obtained Treasury Checks") were deposited into the accounts of GERALDINE PEREZ, the defendant, or her relatives, with a value of approximately $91,000.  As set forth in paragraphs 40-42, below, I believe that the majority of the Improperly Obtained Treasury Checks were based on tax returns fraudulently submitted in the name of Puerto Rican residents, among others, while other checks were based on legitimate tax returns but had been stolen prior to delivery to the intended recipients.

        39.    From speaking to an IRS agent and reviewing bank records I know that there were 23 Improperly Obtained Treasury Checks in total.  Specifically:

21

a.      Approximately 9 Improperly Obtained Treasury
Checks, worth almost $29,000, were deposited into bank accounts
controlled either solely by GERALDINE PEREZ, the defendant, or
jointly by PEREZ and her son.

b.      Approximately 6 Improperly Obtained Treasury
Checks, worth over $42,000, were deposited into the bank
accounts of PEREZ's son.

c.      Approximately 8 Improperly Obtained Treasury
Checks, worth almost $20,000, were deposited into the bank
account of PEREZ's sister.

40.    During the February 6, 2018 interview with
GERALDINE PEREZ, the defendant, discussed in paragraph 27(c),
above, PEREZ stated that she had received tax refund checks in
others' names from an individual who worked at a tax preparation
business (the "Tax Preparer").  PEREZ admitted that she
deposited these checks into her and her children's bank
accounts, and would then split the proceeds with the Tax
Preparer.

41.    Of the 23 Improperly Obtained Treasury Checks, 17
were based on tax returns that listed income which was not
corroborated by records provided to the IRS from third parties
such as banks or employers (for example, a tax return listing W-
2 employment income where no W-2 was provided by the taxpayer's
employer).  Of these, 13 of the taxpayers had Puerto Rican
Social Security numbers or — according to information from IRS
records or commercial databases — addresses.  In these 13 tax
returns in the names of Puerto Rican taxpayers, the tax returns
claimed the filer resides in one of the fifty states of the
United States.

42.    The circumstances regarding the remaining 6
Improperly Obtained Treasury Checks suggest they were procured
by fraud and/or stolen from their legitimate recipients.  For
example:

a.      As to one Improperly Obtained Treasury
Check, I am aware that IRS agents have spoken with the named
beneficiary of the check ("Tax Victim-1"), who stated that Tax
Victim-1 visited the Tax Preparer with GERALDINE PEREZ, the
defendant — a friend who had referred Tax Victim-1 to the Tax
Preparer — and provided the Tax Preparer with information to
fill out a return.  Tax Victim-1 was shown by law enforcement

agents the tax return corresponding to the Improperly Obtained
Treasury Check, and advised that the return listed an extra
dependent that Tax Victim-1 did not have and did not know was
listed on the return. Tax Victim-1 stated that Tax Victim-1
obtained an $800 check from the Tax Preparer, which Tax Victim-1
believed was a tax refund, but that Tax Victim-1 never received
the Improperly Obtained Treasury Check, which was for $2,991.
Accordingly, I believe this Improperly Obtained Treasury Check
was issued based on a fraudulent tax return.

    b. As to another Improperly Obtained Treasury
Check, I am aware that IRS agents have spoken to the named
beneficiary ("Tax Victim-2").  Tax Victim-2 acknowledged having
filed the tax return that generated the check, but stated that
Tax Victim-2 did not receive the check, and only received a
replacement check months later.  Accordingly, I believe this
Improperly Obtained Treasury Check was stolen before it was
delivered to Tax Victim-2.

    WHEREFORE, deponent respectfully requests that
warrants be issued for the arrest of ELIANA BAUTA, GERALDINE
PEREZ, and ERIC GONZALES, the defendants, and that they be
arrested and imprisoned or bailed, as the case may be.

                     JULIA TURRET
                      Special Investigator
                      New York City Department of
                      Investigation - Office of the Inspector
                      General

Sworn to before me this
25th day of September, 2018

THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK